**SUN OIL CO., Plaintiff, v. OHIO TURNPIKE COMMISSION, Defendant.**

Common Pleas Court, Franklin County.

No. 191315.  Decided December 22, 1954.

Effler, Eastman. Stichter & Smith, Toledo, Vorys, Sater, Seymour & Pease, Columbus, for plaintiff.

Frank C. Dunbar, Jr., Columbus, for defendant.

**OPINION**

By LEACH, J.

This cause is now before the court on plaintiff's motion for a temporary injunction and on defendant's oral motion to dissolve the temporary restraining order heretofore granted.

Plaintiff on December 2, 1954, filed its petition requesting equitable relief both by way of injunction and mandatory injunction. A temporary restraining order was granted the same day and the cause set for hearing on the motion for a temporary injunction on December 10, 1954. At such hearing extended arguments of counsel were had, certain stipulations made, some 16 exhibits introduced into evidence, and testimony taken. Briefs have also been filed by both parties. While many of the matters argued and briefed go somewhat extensively into the basic merits of the cause and while this action is not now being considered on the merits, nevertheless such arguments and briefs have been of great benefit to the court.

The plaintiff is a foreign corporation qualified to do business in Ohio, engaged in the business of refining, manufacturing, distributing and selling gasoline and other petroleum products. It is a taxpayer in the state of Ohio. The defendant is in the process of constructing across the northern part of Ohio a turnpike known as "Ohio Turnpike Project No. 1."

In the exercise of the authority granted it by statute, defendant has established on such turnpike 8 pairs of service areas, each pair designated as a "service plaza." A "service plaza" consists of two areas, one north of the travelled portion of the turnpike to serve west-bound traffic and one south of the travelled portion to serve east-bound traffic. Plans call for the establishment in each area of a restaurant, parking areas, playground areas and one gasoline station. In other words, under the plan adopted by the defendant, there will be 8 "service plazas" and 16 service areas, each service area with one gasoline station.

It appears that at least as early as February, 1953, discussions were had between representatives of the defendant and a committee representing the petroleum industry which was acting as a spokesman for several oil companies, including plaintiff, in which the petroleum industry committee took the position that under the language of §1214 GC (now §5537.13 R. C.), it was mandatory that the defendant provide for at least two competing gas stations in each service area. A detailed plan for such "multiple trading area" was submitted to the defendant by this committee in November, 1953. Such plan was rejected by defendant and as heretofore stated, plans prepared providing for **one** gasoline station for each service area.

The evidence indicates that the turnpike will be open for general vehicular travel on October 1, 1955. The plans of the defendant call

for the opening of the "service plazas" at that time. The building to house such gasoline stations will be erected by the defendant and title retained by it. It is expected that the contracts for the construction of such buildings will be let in the next few weeks. It might be stated parenthetically that plaintiff does not seek to enjoin the construction of such buildings.

In September, 1954, defendant issued notice to bidders, etc. calling for bids for the operation of gasoline service stations, the contracts to be denominated SS-1, SS-2, SS-3, SS-4, SS-5, SS-6, SS-7, and SS-8. Each bid in effect was on a pair of service stations since each "service plaza" consisted of two service areas divided by the travelled portions of the turnpike and the dividing space between such travelled portions. As provided in such notice, bids were received and opened on October 21, 1954. Plaintiff submitted a bid on each of the 8 plazas, its bid not being the high bid in any instance.

Subsequent to the receipt of bids, consideration thereof was given by a committee of the defendant, consisting of its secretary, Mr. A. J. Allen, its legal counsel, Mr. Frank Dunbar, Jr., its executive director, Mr. Robert S. Beightler, its chief engineer, Mr. T. J. Kauer, Highway Director and Ex-Officio member of the commission, Mr. S. O. Linzell, and Mr. T. J. Donnelly, consultant engineer and partner in the firm of J. E. Greiner Company. A report was filed by this committee on November 4, 1954. This committee found that the high bid for Contract SS-2 had been submitted by Shell Oil Company; the high bid for Contract SS-3 by Pure Oil Company; the high bid for Contract SS-4 by the Texas Company; that identical high bids were submitted for Contract SS-5 by the Texas Company and Shell Oil Company; that the high bid for Contract SS-6 was submitted by the Texas Company. It recommended that the bid of Shell Oil Company be accepted for Contract SS-5 in view of the fact that the requirements of bidding forbade a bidder from obtaining contracts on adjoining "service plazas." It also recommended that the high bid of Shell Oil Company on Contract SS-1 be rejected and new bids solicited in view of the fact that it had recommended that Contract SS-2 be awarded to Shell Oil Company.

The high bid for Contracts SS-7 and SS-8 were submitted by Speedway Petroleum Corp. The committee reported that such bids were unlike all the others of the high bidders for the other contracts who, in each case, bid upon the furnishing of "regular" and "premium" grades or brands of gasoline. The Committee expressed the opinion "that the public will not be well served unless each of the service stations shall offer to all motorists both the regular and premium grades of gasoline, such as are offered in the great majority of the better service stations all over the country." The committee therefore recommended that no award be made on Contracts SS-7 and SS-8. It further recommended that new bids be taken for Contracts SS-1, SS-7 and SS-8 and "that the bidders should be required to tender their bids upon the basis of furnishing both regular and premium grades of gasoline at all stations."

The Ohio Turnpike Commission on the same day of the committee's report, that is, on November 4, 1954, adopted a resolution which, in effect, accepted the entire report of the committee and awarded Con-

tracts SS-2, SS-3, SS-4, SS-5 and SS-6 to the bidders heretofore referred to.

Thereafter the defendant issued new notice to bidders, etc., calling for bids for the operation of gasoline service stations under Contracts SS-1, SS-7 and SS-8. The notice to bidders varied from the previous notice to bidders only by the addition of the sentence "Successful bidders will be required to sell both 'regular' and 'premium" gasoline at each station covered by their contracts." Bids were to be received and opened on December 3, 1954.

In its motion for temporary injunction and in the prayer of the petition for a temporary injunction, plaintiff moves the court for an order enjoining and restraining the defendant from:

(a) Executing, or delivering to any of the successful bidders, any of the contracts designated by defendant as Contracts SS-2, SS-3, SS-4, SS-5 and SS-6 providing for the operation of gas stations in service plazas numbered 2, 3, 4, 5 and 6; and performing any of said contracts;

(b) Accepting or considering any bids filed with defendant for any of the contracts designated by defendant as Contracts SS-1, SS-7 and SS-8 providing for the operation of gas stations in service plazas numbered 1, 7 and 8, and from awarding or entering into any contracts based upon any such bids;

(c) Including in any future notices to bidders, or in any future terms and conditions of bidding or in any contract for the operation of gas stations, any requirement that the successful bidder shall sell, or offer for sale, more than one grade of gasoline at gas stations covered by the contract or contracts of the successful bidder thereof.

It is conceded that Contracts SS-2, SS-3, SS-4, SS-5 and SS-6 have already been executed and delivered to successful bidders and plaintiff therefore as to paragraph (a) above is now only asking that the defendant be enjoined from "performing any of the contracts" referred to. A temporary restraining order to this effect was issued on December 2, 1954.

Plaintiff in effect is making two basic contentions, (1) that the action of defendant in providing for only one service station for each service area is in violation of the provisions of §5537.13 R. C., and, (2) that the defendant is guilty of an unlawful and arbitrary exercise of power in providing in the most recent notice to bidders that the successful bidders are required to sell both "regular" and "premium" gasoline in each station. These contentions will be considered in that order.

Sec. 5537.13 R. C., insofar as pertinent reads as follows:

"The commission is hereby authorized to fix, revise, charge, and collect tolls for the use of each turnpike project and any extension or sections thereof, and **contract in the manner provided by this section with any person, partnership, association, or corporation desiring the use of any part thereof, including the right of way adjoining the paved portion, for placing thereon** telephone, telegraph, electric light, or power lines, **gas stations,** garages, stores, hotels, and restaurants, or for any other purpose, and fix the terms, conditions, rents, and rates of charge for such use, provided that no toll, charge, or rental is made by the commission for placing in, on, along, over, or under such turnpike pro-

ject, such telephone, telegraph, electric light, or power lines, equipment, or facilities as are necessary to serve establishments located on the turnpike project or to interconnect any public utility facilities, **and provided that a sufficient number of gas stations may be authorized to be established in each service area to permit reasonable competition by private business in the public interest.**

"Contracts for the operation of gas stations, garages, stores, hotels, restaurants, parking facilities, or other purposes **shall be made in writing with the bidder whose bid, in consideration of the public interest, is determined by the commission to be the best bid received,** after advertisement for two consecutive weeks in a newspaper of general circulation in Franklin county and in such other publications as the commission determines. Such notice shall state the general character of the operation proposed, the place where plans and specifications may be examined, and the time and place of receiving bids. Bids shall contain the full name of each person or company interested in them, and shall be in such form as the commission requires. The commission may reject any and all bids. All contracts shall be preserved in the principal office of the commission. * * *" (Emphasis added.)

Plaintiff contends that the word "may" in the text in which it is employed in the language "and, provided that a sufficient number of gas stations may be authorized to be established in each service area to permit reasonable competition by private business in the public interest" is mandatory, citing many cases where the word "may" has been judicially construed to mean "shall" or "must." Plaintiff argues that unless the language is mandatory, it is meaningless since the statute by other language had already given the defendant the authority to contract for the placing of gas stations. Defendant asserts that the word "may" should be given its ordinary grammatical meaning; that in §5537.13 R. C., the word "shall" appears not less than a dozen times indicating that the General Assembly by the use of "may" did not mean "shall"; and that in other portions of the Turnpike Act there are similar cases of duplicating of language granting authority to the Turnpike Commission.

It is fundamental, of course, that the word "may" in its grammatical sense is not mandatory and that a mandatory construction is only followed where the sense of the entire statute under consideration impels such a conclusion. With such a test in mind, it would appear doubtful to this branch of the court as to whether the language under consideration could be considered as imposing a mandatory duty on the part of the defendant to place competing gas stations in each service area. It appears to us that the inclusion of such language does not necessarily indicate a duplication of a grant of authority nor the inclusion of meaningless language, even if such language be construed as being permissive in character. It might easily be construed as forbidding the defendant from legally granting to any one gas station the exclusive franchise to sell at a particular service area to the extent that the defendant would be precluded from electing to place another gas station therein, a matter which at least would not be free from doubt had such language not been included. It might also be construed as authority to expend monies

for additional lands or additional buildings for the placement of competing gas stations, such authority in the absence of such language being open to question in that with a "captive" customer potential, it could be asserted that the income of the defendant would not be increased by such additional stations, that the increased expenditures for such competing stations would be a misapplication of funds, and that the commission in the exercise of its right of eminent domain would have no authority to acquire such additional land as might be needed for such competing gas stations.

It is not necessary, however, to pass on this question at this time. Assuming that the language of the statute is mandatory, assuming that the plaintiff has the legal capacity to maintain this action, assuming that this court should otherwise grant the temporary order requested even in the absence of the successful bidders as parties defendant to this action, and assuming that plaintiff has not been guilty of laches by its failure to file this action when it first determined that the defendant intended to place but one gas station on each service area, nevertheless, we do not see how plaintiff's claim in this respect would be affected one way or the other by a temporary injunction forbidding the defendants from performing any of the contracts designated by defendant as Contracts SS-2, SS-3, SS-4, SS-5 and SS-6 providing for the operation of gas stations in service plazas numbered 2, 3, 4, 5 and 6.

Upon final hearing plaintiff seeks a mandatory order to compel the defendants to place at least a second gas station in each service area. If, upon final hearing the court finds that plaintiff is entitled to such an order, the fact that others are occupying and selling gasoline from an existing station and that the defendant is "performing any of the contracts" by permitting the sale of gasoline under Contracts SS-2, SS-3, SS-4, SS-5 and SS-6 cannot possibly affect any order of the court made at such time.

In this connection it must be remembered that plaintiff does not seek a temporary order to enjoin the construction of the buildings to house the gas stations presently planned. If additional buildings must be built and additional gasoline contracts made, such can be done at the time of the final order of this court without in any way interfering with the then existing buildings and existing contracts. It should also be remembered that as to Contracts SS-2, SS-3, SS-4, SS-5 and SS-6, the question of alleged irregularity as to the bidding because of the requirement that "regular" and "premium" gasoline be sold is not presented. There is no showing as to such contracts that the bid of plaintiff or of any other seller of one grade of gasoline was rejected for such reason. Instead the evidence clearly demonstrates that in each case the defendant determined the high bidder had made "the best bid received."

To the extent that the plaintiff requests a temporary injunction to prohibit the defendant from performing Contracts SS-2, SS-3, SS-4, SS-5 and SS-6, the same is denied and the temporary restraining order heretofore granted prohibiting the performing of any of such contracts is dissolved.

We turn now to a consideration of the notice to bidders as to Con-

tracts SS-1, SS-7 and SS-8. As heretofore noted, such notice provided that successful bidders will be required to sell both "regular" and "premium" gasoline at each station covered by their contracts.

Plaintiff asserts, and the evidence in this respect at the hearing was uncontradicted, that it refines and manufactures but one brand of gasoline, Sunoco; that this is a "premium" gasoline in quality but at the present time and throughout the operations of the plaintiff, it has sold for "regular" gas prices. It contends that the action of the defendant which, in effect, precluded it from bidding on Contracts SS-1, SS-7 and SS-8 will deprive it "of its property rights without due process of law, constitutes an unauthorized assumption of power and an arbitrary, unreasonable, discriminatory, capricious and unlawful exercise thereof, and imposes an unwarranted, unreasonable and unlawful burden on interstate commerce, all to the great injury and detriment of the public, and upon plaintiff."

Evidence was introduced as to the volume of plaintiff's business, particularly in Ohio and of the fact that it has either by direct operation or by lease arrangement some 980 gas stations in Ohio and sells 9.6% of the Ohio gasoline market. As heretofore noted, a committee of the defendant on November 4, 1954, recommended that bidders be required to sell both "regular" and "premium" gasoline, expressing the opinion in a report of that date "that the public will not be served unless each of the service stations shall offer to sell motorists both the regular and premium grades of gasoline, such as are offered at the great majority of the better service stations all over the country."

Defendant contends: (1) That plaintiff does not have the legal capacity to bring such legal action as (a) a taxpayer or (b) a corporation engaged in the business of refining, manufacturing, distributing or selling petroleum products; (2) that the facts alleged do not show any abuse of discretion on the part of the defendant in the sense that abuse of discretion has been construed by the decisions of the Ohio courts; and (3) that in any event a consideration of the potential damage and potential benefit to the plaintiff, to the defendant and to the public in case a temporary order either be granted or denied, would indicate the advisability, if not the necessity, of denying such a temporary order.

In view of the recent decision of the Ohio Supreme Court in the case of **State ex. Masterson v. Ohio State Racing Commission, 162 Oh St 366, 55 O. O. 215**, it would seem that plaintiff would lack capacity to sue as a taxpayer, since no tax funds are involved in the construction and operation of the turnpike. The fact that the turnpike will be maintained by the Department of Highways when the turnpike bonds are fully paid off does not affect the legal capacity of the plaintiff to maintain an action at this time. Plaintiff may or may not be a taxpayer when the turnpike is turned over to the Highway Department and in any exent there is no showing that any delay in paying off the bonds and turning the turnpike over to the Highway Department, which delay might result from denying a high bid of the plaintiff on Contracts SS-1, SS-7 and SS-8 (assuming that plaintiff were to bid and were to be the high bidder) would cause any additional expenditure of tax monies at that time.

In view of the general availability of a taxpayer's action as to most public agencies, we do not find any Ohio decisions which squarely decide the question of the capacity of a party such as the plaintiff, to sue in the capacity of one potentially injured in its business affairs by alleging unlawful acts of a public body organized as is the Turnpike Commission and in using no tax monies. In view of our conclusion as to other aspects of the problem now presented, it is not necessary to pass on this question at this time, however.

Neither is it necessary at this time to pass on the question as to whether the petition alleges facts which show an abuse of discretion or an unlawful and arbitrary exercise of power to the extent that a judicial, as contrasted with an administrative question, is presented. See **State ex. Schaffer v. Ohio Turnpike Commission, 159 Oh St 581, 50 O. O. 465.**

We believe that plaintiff's request that defendant be temporarily enjoined from letting Contracts SS-1, SS-7 and SS-8 and from including a requirement that more than one grade of gasoline be sold at the station of the successful bidder should be denied solely upon a consideration of the relative potential benefits and damages to the parties and to the public.

What benefit can come to the plaintiff in the operation of its business if we enjoin the letting of Contracts SS-1, SS-7 and SS-8? Not until final hearing and even after that, not unless and until plaintiff becomes the successful bidder could it possibly sell gasoline at any of the locations in question. On the other hand the potential damage to the defendant and of even more importance to the public is something which can hardly be measured in money.

But, plaintiff asserts that defendant's own evidence showed that gas stations could be put into operation at service plazas 1, 7 and 8 in something less than 3 months from the time that any temporary order might be dissolved; that the turnpike is due to open October 1, 1955; that a temporary order which would terminate by July 1, 1955, would cause defendant no damage; and that this matter might be advanced for hearing and disposed of on the merits long before that time.

If the potential rights of the defendant to ultimate relief would otherwise be foreclosed by an awarding of Contracts SS-1, SS-2 and SS-3 at this time, we would be inclined to pursue the course suggested by the plaintiff. If plaintiff, however, is able to establish the illegality of defendant's action, as it asserts, any contracts awarded would be predicated on such illegal action of the defendant and the right of the other party to such contract could rise no higher than the authority of the defendant to enter into such a contract, unless such party had so changed its position in reliance on such contract as to make it inequitable to terminate its right thereunder. Proper actions to enjoin may be directed not only against the making of illegal contracts but also against the performance of illegal contracts. See **33 O. Jur. p. 814,** et seq., 43 Am. Jur. p. 967, et seq.

Here it must be remembered that the contracts in question do not involve the construction of buildings by the successful bidder. The bid in effect is merely on a concession to sell gasoline at stations erected

and owned by defendant. If plaintiff is successful at the final hearing in establishing the illegality of defendant's action in requiring bids on "regular" and "premium" gasoline, this court may at such time order the defendant to readvertise and award bids without such illegal requirement. Upon new bids being taken and valid new contracts entered into, the rights of those then selling gasoline by virtue of the "illegal" contracts would terminate. At the same time, however, it would not be necessary to suspend or terminate the necessary sale of gasoline to the public. The new seller could quickly move into the defendant's filling stations and begin operation.

The motion for temporary injunction will be denied and the temporary restraining order heretofore issued on December 2, 1954, will be dissolved.

Entry may be prepared accordingly.